JAMES R. TODD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Todd v. Commissioner
Docket No. 5022-76.
United States Tax Court
T.C. Memo 1978-214; 1978 Tax Ct. Memo LEXIS 300; 37 T.C.M. (CCH) 920; T.C.M. (RIA) 78214; June 8, 1978, Filed Leslie C. Hackler, Jr., for the petitioner. Charles R. Billings, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions in petitioner's Federal income tax: Addition to Tax Year
Deficiency
Sec. 6651(a) [1]/
1972
$ 9,473.00 $ 0
1973
12,156.68
3,039.17
Because of concessions, the sole *301 issue remaining for decision is whether in 1972 and 1973 petitioner is entitled to deductions under section 165 or 166 for monies allegedly advanced to D.D. Golding. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time he filed his petition herein, petitioner resided in Dallas, Texas. During the years in issue petitioner was involved in the oil and gas industry. He had been active in the industry for approximately 20 years, purchasing mineral interests, drilling wells and producing oil and gas. During that 20 year period he had never made cash payments without obtaining a receipt from the payee. In 1969 petitioner became acquainted with Dan Frantzen, a geologist, and between 1969 and 1973 petitioner and Frantzen entered into several oil ventures. In each instance Frantzen located the possible mineral deposits and petitioner financed drilling operations, and they generally shared profits and losses equally. Their agreement with respect to each venture was generally an oral agreement, but was reduced to writing at some point. Customarily petitioner financed these ventures through the use of bank drafts and later requested his *302 bank to honor those drafts. In 1972 petitioner gave Frantzen various documents including a "structure map" and "electrical logs" relating to an area in Cherokee County, Texas, and asked Frantzen to evaluate a certain 400 acre tract allegedly owned by D.D. Golding. Petitioner related to Frantzen that he was involved in a business deal with Golding, but did not divulge the specifics of that business arrangement. Petitioner had initially met Golding in late 1969 or early 1970 in a restaurant in Dallas. Thereafter he and Golding saw one another only occasionally until May 1972. At that point petitioner's and Golding's relationship grew closer and they were together frequently. During the period May 1972 through January 1973, petitioner and Golding maintained apartments in the same complex in Dallas. Also housed within the complex were the corporation offices of Atlas International, Inc. ("Atlas"). Atlas was controlled by Golding; its president, however, was James Maxwell. Between May 1972 and January 1973, petitioner was regularly in the offices of Atlas and frequently invited Golding, Maxwell and other individuals involved with Atlas to his apartment for cocktails. *303 On several occasions while in Atlas' offices petitioner gave large sums of cash to Golding. Maxwell was present on 4 or 5 such occasions. On two other occasions petitioner gave Golding large sums of cash at a bank and at a hotel in Dallas. In both the latter instances Frantzen was present. On February 16, 1973, Golding was convicted of income tax evasion and sentenced to 5 years in prison. Golding had been indicted for tax evasion in September 1972, and was represented by petitioner's nephew in the criminal proceedings. Although petitioner became aware of the criminal matter shortly after September 1972, he, nonetheless, continued giving cash to Golding through January 1973. Following Golding's conviction in February 1973 petitioner asked his nephew to obtain receipts from Golding for the cash payments. Golding refused to give petitioner receipts and the matter was dropped by petitioner. He never brought criminal charges against Golding, nor did he ever file a suit against Golding to compel conveyance of the Cherokee County ranch. In addition, petitioner never made inquiries regarding Golding's reputation nor did he ever cause a title search to be made on the 400 acre *304 Golding ranch. On his income tax return for 1972 and 1973 petitioner claimed deductions for embezzlement losses by reason of his cash payments to Golding. The amount of the claimed deductions was derived from a schedule prepared by petitioner and his accountant. Included within the schedule were the following checks drawn on petitioner's personal and corporate checking accounts: Funds Drawn From
James R. Todd
Todd Oil Co.
Individual Bank
Corporate
Notations on Date
Payee
Account
Account
Checks
1972
5/19
Cash
$ 300 $ 5/22
Cash
1,000
6/23
Cash
1,200
7/26
Cash
2,500
8/04
N.B.C. [2]
3,500 [3]
8/14
Cash
2,000 [4]
8/22
Preston Bank
1,500
Loan
8/24
Cash
2,000
8/29
Cash
2,000
9/26
Cash
1,100
10/13
N.B.C.
1,000
10/27
Cash
4,000
Note
11/24
Atlas Int. Inc.
1,000
12/01
N.B.C.
1,900
12/08
N.B.C.
5,000
12/20
N.B.C.
1,000
12/26
N.B.C.
1,650
12/29
N.B.C.
3,000
Stock
$ 16,050
$ 19,600
Total 1972
$ 35,650
1973
1/02
N.B.C.
3,000
for deal in
1/12
N.B.C.
2,500
Salt Lake
1/17
N.B.C.
2,000
Total 1973
$ 7,500
*305 In addition to the checks petitioner included within the schedule the proceeds of a $ 3,700 loan which he allegedly gave to Golding. In July 1973 respondent initiated an audit of petitioner's income tax returns for 1971 and 1972. In October 1974 [5] Revenue Agent Healy met with petitioner and his accountant. At that meeting Healy inquired whether petitioner had taken any steps to recover the alleged advances. Petitioner related only that he had tried to recover the money, but did not disclose the efforts he had undertaken. In March 1975 Healy concluded his participation in the audit of petitioner's income tax returns. Thereafter, in May 1975 petitioner filed suit against Golding in Dallas County, Texas, seeking recovery of some $ 46,850 he allegedly advanced to Golding. On August 21, 1975, on Golding's motion, the suit was transferred to Cherokee County, Texas. Following the transfer of the case to Cherckee County petitioner did not take any further steps with regard to his suit against Golding; instead, in October 1975 petitioner filed suit against Atlas for recovery of $ 46,850 allegedly advanced to Atlas' agent, Golding. [6] In March 1976 petitioner obtained a default *306 judgment against Atlas. The judgment was never collected; apparently Atlas was judgment proof. In his statutory notices respondent disallowed the claimed embezzlement losses in their entirety because petitioner had failed to substantiate them. OPINION The sole issue for decision is whether in 1972 and 1973 petitioner sustained losses by way of his payments to Golding to which he is entitled to a deduction under section 165 or 166. Petitioner contends that in 1972 he and Golding entered into an oral agreement whereby petitioner would pay Golding an unspecified amount for the mineral interests in Golding's ranch in Cherokee County, Texas. He further contends that between May 1972 and January 1973 he paid Golding $ 44,850 pursuant to their agreement but Golding never transferred any rights in the ranch to petitioner. As a consequence, petitioner concludes that he is entitled to a deduction for the amounts paid Golding under any one of four alternative theories. He asserts that the payments are deductible either as theft losses, bad debts, *307 business losses or losses from a transaction entered into for profit. Respondent, on the other hand, contends that petitioner has failed to prove that any money was transferred in connection with the acquisition of mineral rights in Golding's ranch or for any other purpose, and that, if a loss was in fact sustained, petitioner has failed to prove there was no reasonable prospect of recovery during 1972 and 1973. We agree with respondent's first contention that petitioner has failed to prove how much money he gave Golding and for what purpose, and thus do not reach his alternative contention. It is well settled that respondent's determination in his statutory notice is presumptively correct and that petitioner bears the burden of proving respondent erred in disallowing the claimed deductions. ; . In order to meet his burden petitioner must present "competent and relevant credible evidence." . We, however, are not bound to accept petitioner's testimony at face value even where it is *308 uncontradicted if it is "improbable, unreasonable or questionable." . Petitioner's entire case rests upon his testimony. He presented no documentation whatsoever to substantiate his assertion that he made advances to Golding for the acquisition of the mineral rights in Golding's ranch. Although he has introduced some additional evidence to corroborate his testimony, the record as a whole fails to support petitioner's position. In other words, petitioner's entire story is questionable on its face. In reaching this conclusion we have relied on several factors. First, petitioner was a prudent businessman who had been involved in the oil and gas business for approximately 20 years at the time he entered into the alleged business arrangement with Golding. During that period he had never entered into a transaction in which he made cash advances without obtaining receipts. In financing oil and gas ventures during the period between 1969 and 1973, he customarily issued bank drafts and later instructed the bank to pay the drafts. Petitioner nonetheless asserts that in this instance he paid Golding in cash, because *309 Golding told him he could make better deals for cash and that he continued making advances even after Golding on a number of occasions refused to give him receipts. Second, Golding was indicted for income tax evasion in September 1972. Golding was represented in the criminal matter by petitioner's nephew, who testified at the hearing in this case that he was sure that petitioner was aware of Golding's indictment. Petitioner, however, testified that he wasn't aware of Golding's tax problems until January 1973. Third, petitioner made no attempt to recover the money advanced to Golding or to force Golding to transfer the mineral leases he was allegedly purchasing. Rather, petitioner's actions were aimed solely at obtaining verification of the alleged advances. In January 1973 petitioner asked his nephew to obtain receipts from Golding for the advances; however, Golding refused to give any receipts. Thereafter petitioner did not attempt to institute an action to recover the advances or compel Golding to transfer any mineral leases until 1975. In that year petitioner filed suits against both Golding and Atlas for recovery of the advances. However, these suits were brought following *310 the initiation of an audit of petitioner's tax returns for 1972 and 1973. Fourth petitioner never filed a criminal complaint against Golding although he felt that Golding had stolen the money allegedly advanced. Fifth, petitioner never inquired into Golding's reputation prior to allegedly making advances of $ 45,000. Sixth, though petitioner testified that his agreement with Golding was that Golding would transfer to petitioner the mineral interests in a 400 acre ranch, petitioner never initiated a title search to determine whether, in fact, Golding owned the mineral interests in the ranch. Seventh, there is no evidence that petitioner and Golding ever arrived at a purchase price with respect to the mineral interests in the ranch. Eighth, no written agreement or other documentation exists or ever existed which verifies the alleged agreement between Golding and petitioner. Finally, only four of the checks issued by petitioner bore notations. None of the notations link the checks to the Cherokee County ranch. In addition, petitioner stated that the notations were put on the checks on Golding's instructions. He further testified that he did not put notations on the checks *311 identifying them as advances to Golding because he never thought about it. He also testified, however, that he put the notations on the checks to help him remember what he had given Golding. This testimony is plainly inconsistent on its face. Moreover, if petitioner put the notations on the checks to help him remember what he had given Golding, it seems odd that he did not put notations on all the checks and clearly identify the checks. In the face of these facts, petitioner offered the testimony of four witnesses as corroboration of his own story. However, the testimony of these witnesses does no more than establish several isolated facts which fail to substantiate petitioner's own testimony. Petitioner's first witness, Dan Frantzen, a geologist, testified that he was asked by petitioner to examine a structure map and electrical logs for an area in Cherokee County, Texas. Frantzen testified that he was told that the map related to properties owned by Golding and that petitioner and Golding had some type of business arrangement. He also testified that on two occasions he saw petitioner give Golding large amounts of cash, and that petitioner told him that the payments were *312 part of a business arrangement. There is nothing in Frantzen's testimony that in any way connects the payments with Golding's ranch property. Moreover, Frantzen testified that in his dealings with petitioner their agreements were always reduced to writing at some point and in financing oil and gas transactions petitioner customarily issued drafts to the payee rather than making cash payments. Petitioner's second witness, James Maxwell, was president of Atlas during the period of the alleged payments. Maxwell testified that he saw petitioner give Golding large sums of cash on 4 or 5 occasions. He also testified that Golding told him the payments were with respect to some leases Golding was to acquire for petitioner. Maxwell stated that he accompanied Golding on a trip to Utah to acquire certain mineral leases and that during discussions with the lease owners, it was stated that petitioner was to be the "operator" with respect to the leases. Though this testimony on its face tends to support petitioner's assertion that he made advances to Golding for a business purpose, it contradicts petitioner's version of the purpose of the payments. Petitioner testified that all the payments *313 related to Golding's ranch and that any other properties or deals Golding located would stand on their own. In view of this inhereent contradiction and the fact that Maxwell had no first-hand knowledge of the purpose of the payments, we conclude that Maxwell's testimony fails to corroborate petitioner's testimony. The third witness, Jerry Biesel, was petitioner's nephew and represented Golding in his criminal tax dispute. Biesel testified that in January 1973 petitioner requested that he obtain receipts from Golding for the advances and that Golding resused to give any receipts. Biesel had no first hand knowledge of the reason petitioner made advances to Golding. In addition, Biesel testified that petitioner must have been aware of Golding's indictment for tax evasion prior to January 1973. Petitioner's final witness was his accountant who testified only that he prepared petitioner's 1972 and 1973 tax returns claiming embezzlement losses. In preparing the returns he relied solely upon petitioner's statements that various checks made out to cash or the bank represented advances to Golding which were with respect to the purchase of mineral leases. In short, none of the testimony *314 corroborates petitioner's story.The testimony of petitioner's witnesses establishes only that petitioner made cash advances to Golding. Nothing in the testimony supports petitioner's contention that the advances were with respect to the purchase of the min -al interests in Golding's ranch. In light of this conclusion and the improbable and questionable nature of petitioner's own testimony, we conclude that petitioner has failed to establish that the advances were for the purchase of the mineral interests in Golding's ranch rather than gifts or for some other purpose, such as the repayment of money owed by petitioner to Golding. Decision will be entered for the respondent. Footnotes
1. / All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue. Respondent has conceded that petitioner is not liable for the additions to tax for 1973.↩
2. N.B.C. stands for National Bank of Commerce. ↩
3. This check was used to purchase a cashier's check payable to Santi Enterprises, Inc. The remitter noted on the cashier's check was Atlas. ↩
4. At trial petitioner conceded that this check was improperly included in his schedule.↩
5. Apparently the audit was expanded to include 1973 at some point prior to October 1974. ↩
6. Golding died on December 11, 1975.↩